IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KUHN CONSTRUCTION COMPANY, | ) | |
| | ) | |
| | ) | Civ. No. 10-637-SLR |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DIAMOND STATE PORT CORPORATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

James S. Green, Sr., Esquire of Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware and Paul A. Logan, Esquire of Powell, Trachtman, Logan, Carrle & Lombardo, P.C., King of Prussia, Pennsylvania. Counsel for Plaintiff.

Karl G. Randall, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: John Anthony Wolf, Esquire, John F. Morkan III, Esquire, and Ian I. Friedman, Esquire of Ober, Kaler, Grimes & Shriver, Baltimore, Maryland.

**MEMORANDUM OPINION**

Dated: April 26, 2011
Wilmington, Delaware


**ROBINSON, District Judge**

## I. INTRODUCTION

On July 28, 2010, Kuhn Construction Company ("plaintiff") filed an action against Diamond State Port Corporation ("defendant") asserting claims for civil rights violations pursuant to 42 U.S.C. § 1983 (count I), fraud and misrepresentation (count II), civil conspiracy (count III), and breach of contract (count IV). (D.I. 1) Currently before the court is defendant's motion to dismiss counts I, II, III and IV pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction, and to dismiss counts I, II, and III for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). (D.I. 8) The court has subject matter jurisdiction to resolve the matter pursuant to 28 U.S.C. § 1331.

## II. BACKGROUND

### A. Defendant's Operations

The Delaware General Assembly ("General Assembly") established defendant in 1996 as a public instrumentality of the State with the purpose of owning, operating, and maintaining the Port of Wilmington and related facilities. 29 *Del. C.* § 8781(a) (2010). Defendant's actions and activities are governed by a board of directors that consists of fifteen members: five of the directors are compromised of statutorily-designated Cabinet-level officials; one is the Delaware Controller General; two are the co-chairs of the General Assembly's Joint Legislative Committee on the Capital Improvement Program. *Id.* at § 8781(b). The remaining seven are appointed by the Governor with the advice and consent of the Delaware Senate. *Id.*

2

Defendant has derived funding for certain major capital improvement projects from the State. (D.I. 8) These disbursements have been voluntary and discretionary on the part of the State, which has expressly disclaimed liability for "any debt or liability of [defendant] as a result of any exercise of power by [defendant]." 29 *Del. C.* §8785. The State has heavily subsidized defendant since its creation, resulting in State funding for capital projects and debt service of approximately $165 million. (D.I. 8, ex. 1) This funding comes from the General Assembly in the form of bond bill appropriations and borrowings. (*Id.*) Consequently, the funding for the project at issue is derived solely with money appropriated by the General Assembly. (*Id.*)

Since its creation in 1996 and through the end of 2009, defendant generated total operating revenues of approximately $349 million. (*Id.*) Defendant's operating earnings before depreciation, investment income, and other non-operating items was nearly $57 million. (*Id.*) Defendant, however, had a cash shortfall of approximately $13 million following debt service payments of more than $70 million, net of payments, received from the State for such purposes. (*Id.*)

## B. The Project

In January of 2006, defendant sought funding from the General Assembly for the reconstruction project of Wharf Unit 2, Berth 4, of the Port of Wilmington at the confluence of the Christiana and Delaware Rivers ("the Project"). (D.I. 1 at ¶ 13) Defendant advised the General Assembly that, without remedial action, complete river closure could occur resulting in a loss of jobs, reduction of revenue, and damage to commercial reputation. (*Id.*) Defendant estimated the cost of reconstruction at $11.4

3

million, an amount that was subsequently appropriated for defendant's use by the General Assembly in 2007. (D.I. 8, ex. 2)

Defendant retained Ocean and Coastal Consultants, Inc. ("OCC") to provide certain engineering and consulting services in connection with the project. (D.I. 1 at ¶ 13) OCC developed construction documents for the project, including drawings, plans and specifications to be used for competitive public bidding. (*Id.* at ¶ 16) Defendant solicited competitive bids for the construction work to be performed on the project in the fall of 2006 and again in February of 2007. (*Id.* at ¶¶ 17, 19)

### C. The Contract

Following competitive public bidding and an award to plaintiff, the parties entered into a construction contract for work on the Project at an agreed-upon price of $10.75 million ("the Contract") on March 29, 2007. (D.I. 8) The Contract was intended to include all of the items necessary for the proper execution of the Project by plaintiff, and to "fully prescribe the work to be done, the materials to be furnished, the manner of accomplishing the work, the time within which the work [was] to be completed, and the means of payment." (D.I. 1 at ¶¶ 38-39)

During the course of performance, plaintiff cited a number of changes that needed to be made to the Contract, including: (1) welding of steel pipe piles (*Id.* at ¶¶ 41-68); (2) changes to the datum/elevation survey (*Id.* at ¶¶ 69-96); (3) undisclosed subsurface conditions and obstructions (*Id.* at ¶¶ 97-118); (4) changes to welding requirements (*Id.* at ¶¶ 119-144); and (5) a revision to the contract drawings. (*Id.* at ¶¶ 145-152) Plaintiff alleges that defendant thereafter improperly withheld payments to

4

pay plaintiff for this extra work. (Id. at ¶¶ 155-161) As of the date plaintiff filed this action, plaintiff had submitted applications for payments under the Contract in the amount of $9,393,036.71 and had been paid $9,136,536.71. (D.I. 8, ex. 3) Additionally, plaintiff submitted claims and "force account" billings to defendant in an additional amount of $14,094,370.67 for the extra work and design changes that it incurred during the performance of the Contract. (Id.)

## III. LEGAL STANDARDS

### A. Rule 12(b)(1)

Not only may the lack of subject matter jurisdiction be raised at any time, it cannot be waived, and the court is obliged to address the issue on its own motion. *See Moodie v. Fed. Reserve Bank of NY*, 58 F.3d 879, 882 (2d Cir. 1995). Once jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence. *See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3d Cir. 2000).

Under Rule 12(b)(1), the court's jurisdiction may be challenged either facially (based on the legal sufficiency of the claim) or factually (based on the sufficiency of jurisdictional fact). *See* 2 James W. Moore, Moore's Federal Practice § 12.30[4] (3d ed. 1997). Under a facial challenge to jurisdiction, the court must accept as true the allegations contained in the complaint. *See id.* Dismissal for a facial challenge to jurisdiction is "proper only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous.'" *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408-09 (3d Cir. 1991)

5

(quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)).

Under a factual attack, however, the court is not "confine[d] to allegations in the .
. . complaint, but [can] consider affidavits, depositions, and testimony to resolve factual
issues bearing on jurisdiction." *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir.
1997); *see also Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891-92 (3d
Cir. 1977). In such a situation, "no presumptive truthfulness attaches to plaintiff's
allegations, and the existence of disputed material facts will not preclude the trial court
from evaluating for itself the merits of jurisdictional claims." *Carpet Group*, 227 F.3d at
69 (quoting *Mortensen*, 549 F.2d at 891). Although the court should determine subject
matter jurisdiction at the outset of a case, "the truth of jurisdictional allegations need not
always be determined with finality at the threshold of litigation." 2 Moore § 12.30[1].
Rather, a party may first establish jurisdiction "by means of a nonfrivolous assertion of
jurisdictional elements and any litigation of a contested subject-matter jurisdictional fact
issue occurs in comparatively summary procedure before a judge alone (as distinct
from litigation of the same fact issue as an element of the cause of action, if the claim
survives the jurisdictional objection)." *Jerome B. Grubart, Inc. v. Great Lakes Dredge &
Dock Co.*, 513 U.S. 527, 537-38 (1995) (citations omitted).

## B. Rule 12(b)(6)

In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), the
court must accept all factual allegations in a complaint as true and take them in the light
most favorable to plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher
v. Harbury*, 536 U.S. 403, 406 (2002). A court may consider the pleadings, public

6

record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (interpreting Fed.R.Civ.P. 8(a)) (internal quotations omitted). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 545 (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* Furthermore, "[w]hen there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S.Ct. 1937, 1950 (2009). Such a determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.*

## IV. DISCUSSION

### A. Rule 12(b)(1): Subject Matter Jurisdiction and the Eleventh Amendment

When deciding whether a state instrumentality may invoke the State's immunity, the court is directed to review the relationship between the State and the entity in question to determine whether it should "be treated as an arm of the State." *Regents of*

7

the *Univ. of California v. Doe*, 519 U.S. 425, 429-30 (1997) (quoting *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). The Third Circuit has formulated a comprehensive three factor test to determine whether Eleventh Amendment immunity extends to an entity. *See Fitchik v. New Jersey Trans. Rail Operations, Inc.*, 873 F.2d 655, 659 (1989) (citing *Urbano v. Bd. of Managers*, 415 F.2d 247 (3d Cir. 1969)). The factors must be considered equally, with none of them having predominant importance. *See Benn v. First Judicial Dist. of Pennsylvania*, 426 F.3d 233, 239 (3d Cir. 2005) ("[W]e can no longer ascribe primacy to the first factor [of the sovereign immunity analysis]"); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 546 (3d Cir. 2007) ("[E]ach of the factors must be considered equally in this case. . ."); *Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 229 (3d Cir. 2006) ("We now accord equal consideration to all three prongs of the analysis. . .").

### 1. State treasury

The first factor of the analysis explores the question of "[w]hether the money that would pay the judgment would come from the State," which includes considering "whether payment will come from the State's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility from the agency's debts." *Fitchik*, 873 F.2d at 659. The crux of this criterion is whether the state treasury is legally responsible for the payment of a judgment against the entity. *Febres*, 445 F.3d at 233; *see also Bowers*, 475 F.3d at 547 ("[T]he appropriate question to ask. . . is whether the State is **obligated** to pay or reimburse the [entity] for its debts.").

8

In the case at bar, the State's potential legal liability for defendant's debts has been disclaimed by statute. *See* 29 Del. C. §8785 ("[T]he State shall not assume or be deemed to have assumed any debt or liability of [defendant] as the result of any exercise of power by" defendant). This absence of legal liability provides a "compelling indicator that the state treasury criterion. . . weighs against immunity." *Febres*, 445 F.3d 236. *See Cooper v. SEPTA*, 548 F.3d 296, 304 (3d Cir. 2008) (Pennsylvania's explicit disclaimer of liability for any judgment against SEPTA, 74 Pa. C.S. §1741(c) ("nor shall any of the authority's obligations be deemed to be obligations of the Commonwealth or of any other government agency, or shall the Commonwealth or any government agency be liable for the payment of principal or interest on such obligations"), weighed strongly against immunity).

Defendant contends that the State, despite its legal shield from liability, would be forced as a practical matter to pay excess judgments against defendant. Thus, the arguable practical effect of an adverse judgment against defendant would be an increase in state funding. Defendant's argument relies on the Supreme Court's decision in *Hess v. Port Trans-Hudson Corp.*, 513 U.S. 30 (1994). Although the Court in *Hess* did use the word "practical" in its Eleventh Amendment analysis of the state treasury factor, the standard was clarified in *Doe*, where the Court emphasized that the key question with regard to this factor is whether the State would be **legally** obligated to pay a judgment against the entity. *Doe*, 519 U.S. at 430. *See also Bowers*, 475 F.3d at 547 (holding that "if a State is not under a legal obligation to satisfy a judgment, then any increase in expenditures in the face of an adverse judgment is considered a

9

voluntary or discretionary subsidiary not entitled to Eleventh Amendment protections.");

*Febres*, 445 F.3d at 236 ("we find that the practical or indirect financial effects of a

judgment may enter a court's calculus, but rarely have significant bearing on a

determination of an entity's status as an arm of the State.").

In *Febres*, the Third Circuit held that the fact that the State is the principal source

of an entity's finances does not alone confer immunity or even compel a finding that the

state treasury factor favors immunity. *See Febres*, 445 F.3d 232-33 (holding that

voluntary appropriations of 85% to 90% of an entity's total funding is insufficient to

satisfy the state treasury factor in favor of Eleventh Amendment immunity). The

magnitude of the State's voluntary contributions does not alter the fact that, once

deposited into the entity's accounts, these funds belong to the entity. *Id.* If

subsequently used to pay a judgment, the judgment has been satisfied with the entity's

monies, not the State's. *Id.*

Despite defendant's practical-effects argument, the state treasury factor weighs

against a finding of immunity in this case. While the State has provided $165 million in

funding for capital projects and debt service for defendant since its creation (D.I. 13),

this factor, taken alone, is not sufficient to weigh in favor of immunity. *See Cooper*, 548

F.3d 303-04 (noting that it was immaterial under *Febres* whether SEPTA received 35%

or 52% of its funding from the Commonwealth). Further, defendant has provided no

evidence that the State would, in fact, contribute additional funding to defendant in the

event of an excess judgment. Most importantly, the State is not legally obligated to

provide funds to satisfy a judgment against defendant. *See Doe*, 519 U.S. at 430 (the

10

State's potential legal liability is the "key factor" under this analysis and "merits far greater weight" than practical consequences). Defendant's asserted consequences do not give rise to the sort of practical obligations that could, in some circumstances, bear on the final determination. Accordingly, the state treasury factor weighs against a finding of sovereign immunity.

### 2. Status under state law

The second factor of the analysis inquires into "[t]he status of the agency under state law." *Fitchik*, 873 F.2d at 659. More specifically, the court should examine "how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued on its own right, and whether it is immune from state taxation." *Id.*

A number of factors indicate that defendant is not an arm of the State. Under its enabling statute, defendant has: (1) a separate corporate existence, 29 Del. C. § 8781(a); (2) the power to sue and be sued, *id.* at § 8784(1); (3) any and all powers available to a corporation organized under Delaware law, *id.* at § 8784; and (4) no power to tax, issue bonds, or exercise eminent domain, *id.* at § 8784(3). Except for certain limited exceptions, employees of defendant are not state employees. *Id.* at § 8789(a).[1] Moreover, defendant is not subject to the Delaware Administrative Procedures Act. *Id.* at § 10102. Finally, defendant is not listed as a state agency on Delaware's departmental list of state agencies. (D.I. 13)

---

[1] Defendant's employees are "state employees" for participation in medical and worker's compensation insurance and deferred compensation plans. *See* 29 Del. C. § 8789(a). Even in these limited exceptions, defendant, not the State, has substantial control. *Id.*

Defendant contends that it is a surrogate of the State of Delaware since the statute characterizes defendant as "a public instrumentality of the State. . . created for the purpose of exercising essential governmental functions." 29 Del. C. § 8781(a). The Third Circuit, however, has found that such characterization is not "dispositive of [the] inquiry - it is certainly relevant, but does not necessarily overshadow the other relevant subfactors in assessing an agency's status under state law for Eleventh Amendment purposes." *See Cooper*, 548 F. 3d at 308.

Defendant also asserts that no Delaware state court has addressed defendant's status as a state agency, but that it is clear that Delaware state courts would hold that it has such status. Even if this were true, the Third Circuit has held that such a designation, while significant, is not dispositive. *See Cooper*, 548 F.3d at 308; *Boldin v. Septa*, 953 F.2d 807, 817 (3d Cir. 1991).

These subfactors, when taken together, indicate that defendant is not a surrogate of the State of Delaware. The Third Circuit has developed a set of inquiries that looks beyond statutory language, such as that of 29 Del. C. § 8781(a), and state distinctions. As such, this prong of the test weighs against a finding of Eleventh Amendment immunity for defendant.

### 3. Autonomy

The third factor of the analysis considers "[w]hat degree of autonomy the agency has." *Fitchik*, 873 F.2d at 659. A number of factors indicate that defendant is autonomous. Under its enabling statute, defendant: (1) possesses all of the power and authority necessary to operate, 29 Del. C. § 8780(4); (2) can adopt by-laws to govern its

12

affairs and organize its internal structure,[2] *id.* at § 8784(1); (3) can engage personnel and retain engineers, advisors, and legal counsel, *id.* at § 8784(2); (4) can enter into contracts in its own name,[3] *id.* at § 8784(1); (5) can burrow funds in its own name, *id.* at § 8784(1); and (6) can develop, construct, purchase, lease, maintain, improve, own, operate or control facilities and real and personal property. *Id.*

Defendant contends that it is not autonomous based on the fact that the sole owner of defendant is the Delaware Department of State. Further, defendant argues that its board of directors is controlled exclusively by the State in terms of both composition and method of appointment, as a statutorily mandated majority (eight of fifteen) of its board members are Cabinet or other high-level state officials, while the remaining seven directors are appointed by the Governor with the advice and consent of the Delaware Senate. *Id.* at § 8781. Additionally, approval of the General Assembly is required in order to amend defendant's certificate of incorporation, to effect a merger or dissolution, or to effect a sale of all or substantially all of defendant's assets.[4] *Id.*

Based on the evidence presented, the State's control over defendant falls short of that which is necessary for immunity to be granted. Defendant is not "highly

---

[2] Defendant can adopt rules and regulations to carry out and revise its rules and regulations without the approval or review of the State. 29 Del. C. § 8784(1).

[3] Defendant can secure, and has secured, insurance, including errors and omissions insurance. (D.I. 13)

[4] The Governor is constrained in his selection of those directors: "[t]here shall be at least 1 director from each of the 3 counties of the State, at least 1 director from the City of Wilmington and 3 directors who shall fill at-large positions on the Board. Of these 7 directors no more than 4 shall be registered in the same major political party." 29 Del. C. § 8781(b).

autonomous,"[5] but the circumstances in this case are notably distinguishable from those in which entities have been accorded immunity. *See Kovats v. Rutgers*, 822 F.2d 1303 (3d Cir. 1987) (holding that Rutgers University was largely "autonomous and subject only to state supervision and control); *Fitchik*, 873 F.2d at 664 (holding that despite the board of New Jersey Transit having a substantial amount of independence in decision making, the fact that the Governor had veto power over the board's actions was sufficient to favor a finding of immunity); *Febres*, 445 F.3d at 231 (holding that the Governor's authority to accept or reject any action taken by the Camden Board of Education was indicative of a lack of autonomy from the State, and weighed in favor of immunity). As a result, this factor weighs against a finding of Eleventh Amendment immunity.

### 4. Balancing the factors

With equal consideration being given to all three factors in the balancing process, and with all three factors weighing against a finding of sovereign immunity for defendant, on balance, defendant is not immune from suit under the Eleventh Amendment.

### B. Rule 12(b)(6): Motion to Dismiss for Failure to State a Claim Upon Which Relief can be Granted

#### 1. Count I: civil rights

##### a. 42 U.S.C. § 1983: substantive due process

The Due Process Clause of the Fourteenth Amendment contains a substantive

---

[5] *See Cooper*, 548 F.3d at 311 (holding that the mere fact that the Commonwealth supported SEPTA financially is not sufficient to show a lack of autonomy and grant immunity).

component that bars arbitrary, wrongful government action "regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). To set forth a substantive due process claim under 42 U.S.C. § 1983, a plaintiff must assert a constitutionally protected liberty or property interest that has been interfered with by a defendant acting under the color of state law. *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972); *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592 (3d Cir. 1995); *C & C Const. Rehab. Specialists v. Wilmington Hous. Auth.*, 1996 WL 190011, at *2 (D. Del. March, 20 1996). The Third Circuit has held that a substantive due process claim grounded in an arbitrary exercise of governmental authority may be maintained only where the plaintiff has been deprived of a "particular quality of property interest." *DeBlasio*, 53 F.3d at 600; *Reich v. Beharry*, 883 F.2d 239, 244 (3d Cir. 1989) ("[i]n this circuit at least, not all property interests worthy of procedural due process protection are protected by the concept of substantive due process").

The Supreme Court has considered liberty interests under the Constitution to be "broad indeed." *Bd. of Regents v. Roth*, 408 U.S. 564, 572 (1972). The Third Circuit has held that there is a protected liberty interest associated with pursuing a calling or occupation, and doing so without undue and arbitrary governmental interference. *See Thomas v. Independence Township*, 463 F.3d 285, 297 (3d Cir. 2006). Such a liberty interest has been described as

> [t]he right to hold specific private employment and to follow a chosen profession free from unreasonable government interference within both the "liberty" and "property" concepts of the Fifth and Fourteenth Amendments. . . . The Constitution only protects this liberty from state actions that threaten to deprive persons of the right to pursue their chosen occupation. State actions that exclude a person from one particular job are not actionable in

suits. . . . brought directly under the due process clause.

*Piecknick v. Commonwealth of Pa.*, 36 F.3d 1250, 1259 (3d Cir. 1994) (citations

omitted). Thus, to establish a due process violation, plaintiff is required to plead a

"plausible claim" that defendant deprived its right "to pursue a calling or occupation."

The Third Circuit has held that the mere withholding of contractual payments that

results in a contractor being left with insufficient capital to pursue other work "alone

cannot convert a contract claim into a deprivation of liberty." *Linan-Faye Constr. Co. v.*

*Hous. Auth. of City of Camden*, 49 F.3d 915, 932 (3d Cir. 1995) (holding that § 1983

cannot be used "to constitutionalize contractual interests that are not associated with

any cognizable status of the claimant beyond its temporary role as a government

contractor); *Reich*, 883 F.2d at 244-45 (prompt receipt of payment under a

governmental contract is not the "certain quality" of property interest worthy of

substantive due process protection); *College Savings Bank v. Florida Prepaid*

*Postsecondary Ed. Expense Bd.*, 131 F.3d 353, 361 (3d Cir. 1997) ("just because the

state's actions impact on a private business does not mean that this action somehow

impinges on the Fourteenth Amendment rights of the private individual"); *Thomas*, 463

F.3d at 297 (governmental officials' denial of an application for a liquor license transfer

could only succeed as a due process claim if plaintiff could establish a campaign of

governmental and police defamation, harassment, and intimidation).

Plaintiff does not contend that defendant deprived it of the right to pursue its

chosen business; rather, it claims that non-payment under the Contract purportedly had

severe financial effects in that working capital was tied up, cash reserves were frozen

and depleted, and its equipment and bonding capacity frozen. (D.I. 12) Plaintiff, therefore, has failed to establish a cognizable liberty interest and has failed to state a claim upon which relief can be granted under § 1983 for a substantive due process violation.

### b. 42 U.S.C. § 1983: procedural due process

The Fourteenth Amendment forbids a state actor from depriving a person of life, liberty, or property without due process of law. To state a claim under 42 U.S.C. § 1983 for "deprivation of procedural due process rights, a plaintiff must allege that: (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property;' and (2) the procedures available to him did not provide 'due process of the law.'" *Hill v. Borough of Kutztown*, 445 F.2d 225, 233-34 (3d. Cir. 2006). In its essence, procedural due process is the "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976).

The Third Circuit has held that not all property interests created by contract are clothed with constitutional protection. *Boyd v. Rockwood Area Sch. Dist.*, 105 Fed. Appx. 382, 386 (3d Cir. 2004); *Linan-Faye*, 49 F.2d at 932; *Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1397 (3d Cir. 1991). This was noted in the Court's holding in *Reich*:

> Many. . . courts have observed that if every breach of contract by someone acting under the color of state law constituted a deprivation of property for procedural due process purposes, the federal courts would be called upon to pass judgment on the procedural fairness of the processing of a myriad of contract claims against public entities. We agree that such a wholesale

17

federalization of state public contract law seems far afield from the great purposes of the due process clause.

883 F.2d at 242 (citations omitted). Although it is well established that a contract with a state entity may, under certain conditions, give rise to a property right protected under the Fourteenth Amendment, not every interest held by virtue of a government contract implicates due process and the mere alleged breach of a contract by a government instrumentality does not necessarily give rise to a violation of constitutional dimension. *Linan-Faye*, 49 F.3d at 931-32.

Only two general types of contracts have been recognized as constituting a property interest protected by due process. The first type of contract confers a protected status, which is characterized by extreme dependence, permanence, or both, while the second type "arises where the contract itself includes a provision that the state entity can terminate the contract only for cause." *Unger*, 928 F.2d at 1399.

Plaintiff has failed to allege a constitutionally protected property interest in the payments allegedly due under the Contract. *See Linan-Faye*, 49 F.2d at 932. Further, plaintiff has not alleged that the Contract falls into either of the two aforementioned categories. To recognize a remedy under § 1983 would create the "wholesale federalization of state public contract law" that the Third Circuit cautioned against in *Reich*.[6] As a result, plaintiff has failed to state a claim upon which relief can be granted under § 1983 for a procedural due process violation.

### 2. Count II: fraud and misrepresentation

---

[6] Plaintiff has also been afforded a mechanism for challenging certain provisions of the contract pursuant to the state court system, and has done so successfully. *See Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393 (2010).

18

In order for plaintiff to allege fraud or mistake and withstand defendant's motion to dismiss, it must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires that, "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." In doing so, plaintiff "must allege who made a misrepresentation to whom and the general content of the misrepresentation. *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004). This requirement may be satisfied by "pleading the date, place or time of the fraud, or through alternate means of injecting precision and some other measure of substantiation into [plaintiff's] allegation of fraud. *Id.* The use of "boiler plate and conclusory allegations will not suffice." *In re Burlington Coat Factory*, 114 F.3d 1410, 1418 (3d Cir. 1997).

In order to state a claim for fraud in the inducement, a plaintiff must plead with particularity the following elements: (1) a false representation of material fact; (2) the defendant's knowledge of or belief as to the falsity of the representation or the defendant's reckless indifference to the truth of the representation; (3) the defendant's intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance. *Stephenson v. Capano Development Co.*, 462 A.2d 1069, 1073 (Del. 1983); *Duffield Assoc., Inc. V. Meridan Architects & Eng'r, LLC*, Civ. No. S10C-03–004 RFS, 2010 WL 2802409, at *4 (Del. Super. July 12, 2010).

Plaintiff contends that defendant made numerous false representations concerning the project conditions and technical requirements at the time of bidding, particularly:

19

> (1) the non-disclosure of critical pre-bid investigations and analysis by [defendant] concerning the unstable slope and subsurface obstructions; (2) the extent to which the work would be above mean sea level; and (3) the requirements for coupling the sections of steel pipe pile and filing the steel pipe pile with reinforcing rod and concrete.

(D.I. 12)

Scienter is an essential element in pleading fraud. *Liafail, Inc. v. Learning 2000, Inc.*, Civ. Nos. 01-599 GMS, 01-678 GMS, 2002 WL 31667861, at *4 (D. Del. Nov. 25, 2002). Plaintiff has failed to allege that defendant knew or believed that the information that was provided was either false or purposefully misleading. Further, plaintiff has not identified the content of the alleged misrepresentations or how the claimed representations were false. The failure to allege circumstances indicating conscious or reckless behavior by the defendant, or facts showing a motive or clear opportunity for committing fraud cause plaintiff's claim to fail as a matter of law. *See In re Great Atlantic & Pacific Tea Co., Inc. Securities Litigation*, 103 Fed. Appx. 465, 470-71 (3d Cir. 2004) (plaintiff's fraud in the inducement claim failed as a matter of law due to a lack of circumstances alleged in the pleading supporting defendant's scienter); *City of Roseville Emp. Retirement Sys., et al. v. Horizon Lines, Inc., et al.*, 713 F. Supp. 2d 378, 403 (D. Del. 2010) (plaintiffs' fraud in the inducement claim was dismissed due to a failure to plead particularized facts sufficient to establish scienter).

As a result, plaintiff has not met the heightened pleading standards required by Rule 9(b), and has failed to state a claim upon which relief can be granted for fraud or misrepresentation.

### 3. Count III: civil conspiracy

Civil conspiracy is not an independent cause of action; rather, it must be predicated on an underlying wrong. *Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998). Thus, if plaintiff fails to adequately allege the elements of the underlying claim, the conspiracy claim must be dismissed. *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 892 (Del. Ch. 2009). Plaintiff contends that defendant conspired with OCC to breach the contract and to cause plaintiff to suffer contractual damages. (D.I. 12) As explained above, plaintiff's claims under counts I and II fail to state a claim upon which relief can be granted. Further, count IV, plaintiff's breach of contract claim, cannot constitute an underlying wrong on which a claim of civil conspiracy can be based, unless the breach also constitutes an independent tort. *See E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 445 (Del. 1996); *Kuroda*, 971 A.2d at 892. As a result, plaintiff has failed to state a claim upon which relief can be granted for civil conspiracy.

## V. CONCLUSION

For the aforementioned reasons, the court denies defendant's motion to dismiss with respect to subject matter jurisdiction, in that defendant is not immune from suit under the Eleventh Amendment. The court grants defendant's motion to dismiss with respect to plaintiff's substantive and procedural due process claims, fraud and misrepresentation claim, and civil conspiracy claim.[7] An appropriate order shall issue.[8]

---

[7] Defendant did not move to dismiss plaintiff's breach of contract claim (count IV).

[8] The court questions whether or not it retains subject matter jurisdiction over the breach of contract claim (count IV) since there is no complete diversity of the parties, and no federal question remains.